510 P.2d 768

George TRYON et al., Appellants,

v.

P. W. (Buster) NAEGLE and Marion Naegle, Appellees.

No. 1 CA–CIV 1900.

Court of Appeals of Arizona, Division 1, Department B.

June 12, 1973.

Rehearing Denied July 10, 1973.

Review Denied Sept. 25, 1973.

Philip M. Haggerty, Phoenix, for appellants.

Shimmel, Hill & Bishop, P. C., by James W. Hill, and Richard B. Johnson, Phoenix, for appellees.

JACOBSON, Chief Judge.

This appeal by the plaintiffs in a personal injury action presents for review the trial court's granting of an additur in lieu of a new trial and the alleged prejudicial effect of certain instructions on damages.

The action arose out of a rear-end automobile collision which resulted in injuries to plaintiffs Lenore Tryon, the driver of the leading vehicle, and Karen Tryon, a front seat passenger.[1] Liability is not in dispute, but rather the extent of damages.

After a three-day trial, the jury returned a verdict awarding $20,000.00 damages to Lenore Tryon and awarding $25.00 damages to her daughter Karen. A timely motion for new trial was made by plaintiffs. This motion was granted on the issue of damages, providing that the new trial would be held unless a statement accepting an additur of $7,000.00 for Lenore Tryon and $875.00 for Karen Tryon was filed by the defendants.

1. The medical evidence indicates that Lenore Tryon suffered that most common injury of rear-end automobile collisions, a "whiplash" injury of the neck.

This statement accepting the additurs as to both plaintiffs was filed with the trial court which then entered a formal judgment in the increased amounts, while denying a new trial. From this judgment and order denying a new trial the plaintiffs have appealed.

Plaintiffs-appellants' challenges to this judgment and order can be reduced to four principal issues:

(1) whether the jury's verdict was the result either of passion and prejudice or of a compromise which was not cured by the additur;

(2) whether certain instructions on damages were improper and therefore constituted reversible error;

(3) whether comment by defense counsel in closing argument concerning the defendants' financial ability to satisfy a judgment was improper and therefore constituted reversible error; and,

(4) whether the defendants' sole medical witness testified outside his area of medical expertise concerning plaintiff Lenore Tryon's symptoms.

Appellants contend that since Lenore Tryon has been hospitalized for 112 days on six occasions with five surgical procedures, has incurred medical expenses in the amount of $17,000.00, has been treated by physicians for pain for over five years, and has sustained a 20% permanent partial disability, and as medical specials for Karen Tryon in the amount of $300.00 were proven, a jury verdict for $20,000.00 and $25.00, respectively, indicates either a verdict which was the product of passion and prejudice or a compromise verdict. Appellants further contend that the additur granted as an alternative to a new trial on damages was insufficient as a matter of law to cure the tainted verdict.

Recently, the Arizona Supreme Court examined the case law from 1934 to the present in this state concerning review of the size of jury verdicts and the granting or refusing of a trial judge's adjustment of a verdict. Creamer v. Troiano, 108 Ariz. 573, 503 P.2d 794 (1972), overruling Zadro v. Snyder, 11 Ariz.App. 363, 464 P.2d 809 (1970).

Noting that that court had "nearly forty years ago set out a rule which is still good today," Chief Justice Hays reiterated the test in this jurisdiction for reviewing a trial judge's ruling on additur, remittitur, and new trial because of an inadequate or excessive verdict as follows:

"From what we have written, it is obvious that the test for reviewing the granting or refusing of a trial judge's adjustment of a verdict is complex and can only be solved by an ad hoc approach. Almost always when there is a conflict in the evidence, the trial judge should not interfere with what is peculiarly the jury's function, and if he does not, we will nearly always uphold him. If there is no conflict in the evidence on items that obviously were omitted from the verdict, the trial judge must adjust, and we will uphold him if he does. Behind all of these tests still stands the original doctrine—that if the verdict is supported by adequate evidence, it will not be disturbed, and the greatest possible discretion is in the hands of the trial judge." 108 Ariz. at 576–577, 503 P.2d at 797–798.

Previously in that opinion after examining "a representative rather than an exhaustive list of our cases on the subject of the size of jury verdicts," Chief Justice Hays pointed out that:

"It is interesting to note that in every single one of these cases we affirmed the trial court's order. That in itself should carry a strong inference that one of the key factors in our decisions is to give the trial judge the benefit of the doubt. Like the jury, he has had the opportunity to observe the witnesses' demeanor on the stand, and his ruling on additur, remittitur, and new trial, because of an inadequate or excessive verdict, will generally be affirmed, because it will nearly always be more soundly

based than ours can be." 108 Ariz. at 575, 503 P.2d at 796.

We are of the opinion that the granting of the additurs in the instant case "is supported by adequate evidence" and an "unjust result" did not occur. Nor, in our opinion, was the jury's verdict so inadequate as to manifestly indicate passion, prejudice, mistake or a complete disregard of the evidence. Creamer v. Troiano, *supra*; Larriva v. Widmer, 101 Ariz. 1, 415 P.2d 424 (1966); Wry v. Dial, 18 Ariz.App. 503, 503 P.2d 979 (1972); Braun v. Moreno, 11 Ariz.App. 509, 466 P.2d 60 (1970); Hardy v. So. Pac. Empls. Ass'n, 10 Ariz.App. 464, 459 P.2d 743 (1969).

While appellants point to the extent of plaintiff Lenore Tryon's hospitalizations, as noted above, the evidence also shows the following as far as she was concerned.

Dr. Carl Bjorklund, who treated Lenore Tryon during her first hospitalization, testified that Mrs. Tryon following the accident was having a "nervous reaction to her injury," that she improved and was improving gradually during this hospitalization, and that she was suffering mild distress as opposed to acute or no distress.

Dr. Alvin L. Swenson, who treated Lenore Tryon orthopedically while she was hospitalized and after discharge until February 1966, testified that after February 1966 "as far as therapy treatment from an orthopedic standpoint they seemed to have done all they could and continuation of exercises and continuation under the care of [Mrs. Tyron's] family physician would be helpful." Doctors Swenson, George T. Hoffman and Abraham Ettleson all testified that Mrs. Tryon had underlying psychological problems which resulted in emotional disturbances that interfered with her recovery. However, they all agreed that organically her complaints were unsubstantiated.

■ While the psychological problems being experienced by Mrs. Tryon may have been the proper subject matter of consideration by the jury in awarding damages, assuming these were causally connected to the defendants' acts, the amount of such damages is normally entirely within the province of the jury.

As to Karen Tryon's injuries, Dr. Swenson testified that by the time he last saw her on February 5, 1966, Karen,

"had made a satisfactory recovery as far as her neck was concerned and as far as the cervical spine was concerned, and I further felt that her back was improved. It was a little too early to say that she was completely recovered from her back as I did about her neck, but at least in her back there was no evidence of nerve root pressure, and I felt again that if she would continue on the exercise program and continue to try to sleep on her side and her back and with further passing of time and with the exercises that she should recover quite satisfactorily and recover as far as her back was concerned, too."

Concerning Karen Tryon, Dr. Hoffman, testified as follows:

"A. . . . I saw her on one occasion, November 20, 1967.

"Q. Now, Doctor, could you tell us what your findings were and what treatment, if any, you gave for her?

"A. *At that examination I was unable to find any objective findings,* unable to demonstrate any of the abnormality which she complained of. I indicated further I felt it would be worthwhile to re-examine her at a later date.

\*  \*  \*  \*  \*  \*

"Q. Doctor, based upon the facts that she gave you and from your examination, could you tell us with a reasonable degree of medical certainty whether or not the things she described and the pain and symptoms she described were a direct cause of the accident she described to you?

"A. This could relate to the history which she gave me [including the accident] but *I was unable to find any objective findings upon examination.*" (Emphasis added.)

This examination's result agreed with the favorable prognosis of Dr. Swenson given almost a year and a half earlier.

We have reviewed the entire transcript of this case, and in our opinion, the record does not compel a conclusion that the trial court's order is not "supported by adequate evidence." *Creamer v. Troiano, supra.* We can find no denial of justice, but rather are of the opinion that a just result was attained. Accordingly, we affirm the trial court's formal judgment including the additurs in the stated amounts and its order denying a new trial on the issue of damages.

Appellants' second principal contention constitutes an attack on MARJI Instruction 15 insofar as this instruction "infer[s] that the jury may accept or reject uncontradicted expert testimony and infer[s] that the jury may substitute its own opinion as to necessity and reasonableness [of medical treatment and expenses in the instant case] based on nothing more than its own lay knowledge and speculation and in the face of uncontradicted and unimpeached proof."

■ This Court would review this alleged reversible error were it not for the fact that any objection was waived, as no timely objection to this instruction was interposed. Rule 51(a), Rules of Civil Procedure, 16 A.R.S.; *Whitly v. Moore,* 5 Ariz.App. 369, 427 P.2d 350 (1967).

The only exception to this rule is where such an instruction constitutes "fundamental and reversible error in that it deprived appellant of a constitutional right." *Trojanovich v. Marshall,* 95 Ariz. 145, 146, 388 P.2d 149, 150 (1963).

■ However, we are of the opinion that our holding in *Moser v. Mardian Construction Co.,* 20 Ariz.App. 27, 509 P.2d 1064 (filed May 15, 1973), is dispositive of this contention. There we stated that:

"[T]he doctrine of fundamental error in civil cases should be sparingly applied, *Ortega v. State,* 6 Ariz.App. 356, 432 P. 2d 904 (1967), and possibly limited to those cases where the instruction deprives either party of a constitutional right. *The instructions complained of here* are neither subject to the constitutional infirmities noted in *Layton v. Rocha,* 90 Ariz. 369, 368 P.2d 444 (1962), nor in our opinion do they undercut the very foundation of the plaintiffs' causes of action. *See, Wagner v. Coronet Hotel,* 10 Ariz.App. 296, 458 P.2d 390 (1969). The fact that . . . plaintiffs in this action obtained a judgment against the defendants merely underscores this last observation.

"We therefore hold that the giving of the complained of instructions, not constituting fundamental error coupled with the failure of the plaintiffs to timely object waives their right to have this matter reviewed on appeal."

Appellants further contend that the following statement of defense counsel to the jury in closing argument was improper and constituted reversible error:

"[w]ith respect to the Naegles, the amount of money in excess of 15 to 20,000 would be very tragic to these people. It would be unconscionable . . . .."

No objection was made to this statement.

■ While we agree that this kind of comment is improper and trial counsel should refrain from commenting on a party's financial ability to satisfy a judgment, we are of the opinion that this comment did not constitute fundamental error and whether it would constitute reversible error or not, we deem such error waived by failure to object. "Claims of error will not be considered on appeal where the trial court has not been given the opportunity to rule on an issue so as to correct the possible errors." *State v. Coward,* 108 Ariz. 270, 271, 496 P.2d 131, 132 (1972); *State v. Deschamps,* 105 Ariz. 530, 468 P.2d 383 (1970).

Appellants lastly contend that Dr. Abraham Ettleson testified outside his area of expertise when he stated that Lenore

Tryon's present physical symptoms were due to a conversion hysteria, i. e., the transformation of emotional disturbances into physical symptoms. Cantor, P. D., ed., 4 Traumatic Medicine and Surgery for the Attorney 528 (1961).

Dr. Ettleson was qualified as a practicing neurosurgeon. Mrs. Tryon suffered a "whiplash" injury. It has been noted that "[t]he physicians best suited to evaluate a lash injury are (1) the orthopedic surgeon, (2) the neurosurgeon, (3) the neuropsychiatrist, (4) the eye, ear, nose, and throat specialist, and (5) where the orthopedist is unable to supervise the physiotherapy, a physiatrist . . . ." Frankel, C. J., ed., 1 Lawyers' Medical Cyclopedia 740 (1966). Here a physician and physiatrist, a general practitioner, an orthopedist, and two neurosurgeons testified at trial (in addition to the reading of the deposition of an orthopedist.) Clearly, sufficient medical experts testified to evaluate Mrs. Tryon's injuries.

Dr. Ettleson's testimony was to the effect that Mrs. Tryon was suffering a conversion, which the medical tests indicate is a very common reaction to "whiplash" injuries, leading many patients to have primarily psychogenic symptoms. Frankel, *supra*, at 789–793. A close reading of Dr. Hoffman's testimony, especially the testimony relating to Mrs. Tryon's "anxiety and tenseness," and that of Drs. Bjorklund and Swenson relating to Mrs. Tryon's "nervous reaction to her injury" indicates that these doctors were referring to what Dr. Ettleson characterized as a conversion hysteria. In essence, while Drs. Hoffman, Bjorklund and Swenson referring loosely to Mrs. Tryon's "emotional reaction," Dr. Ettleson gave it the correct medical characterization.

We are of the opinion that Dr. Ettleson was not testifying outside the area of his expertise, but rather that he was qualified to state the nature of the physical symptoms of Mrs. Tryon. He merely testified to the medical character of the "emotional reaction" of Mrs. Tryon, a fact to which the other doctors, including a phy-

siatrist and an orthopedist, had previously made reference. The development of psychogenic symptoms and psychoneurotic reactions in "whiplash" plaintiffs is common, and a treating neurosurgeon may testify as to these matters. Frankel, *supra*, at 792.

For the foregoing reasons, the judgment of the trial court is affirmed.

EUBANK, P. J., and HAIRE, J., concur.